Filed 5/23/22 (unmodified opn. attached)

# CERTIFIED FOR PARTIAL PUBLICATION*

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B300396 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA143448) |
| v. | ORDER MODIFYING OPINION AND DENYING REHEARING |
| LUIS JULIAN BELTRAN PEREZ et al., | |
| Defendants and Appellants. | [CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on May 2, 2022 be modified as follows:

1. On page 1, the unnumbered footnote, delete XV to read as the below unnumbered footnote.

---

* This opinion is certified for publication with the exception of the CONTENTIONS section and parts I, II, IV, V, VII, VIII, IX, X, XI, XII, XIII, XIV of the DISCUSSION section. (Cal. Rules of Court, rule 8.1110.)

2.  On page 16, second to fifth lines from the top, beginning with "(13) the trial court failed to consider its discretion" and ending with "sentencing minute orders must be corrected" are deleted and the following is inserted in its place:

> and (13) the abstracts of judgment and sentencing orders must be corrected.

3.  On page 29, seventh line in the first full paragraph, the word "not" is inserted between the words "are" and "supported," so that it reads:

> theory of aiding and abetting, are not supported by substantial evidence.

4.  On page 38, footnote 11, the sentence beginning with "Because we are reversing" is deleted and the following is inserted in its place:

> We must also reverse the vicarious gang-related firearm enhancements alleged under section 12022.53.  To find the gang-related firearm enhancements true, the jury was required to find that the defendants violated section 186.22, subdivision (b), and that a principal in the offense committed an act in violation of section 12022.53.  With the reversal of the gang enhancements under section 186.22, there is an insufficient basis to support the true findings on the vicarious gang-related firearm use enhancements under section 12022.53.  They must be reversed.

5.  On page 55, part XIII of the DISCUSSION section is deleted.  Part XIV of the DISCUSSION section is renumbered as part XIII.  Part XV of the DISCUSSION section is renumbered as part XIV.

6. On page 59, the first two sentences of the last paragraph beginning with "The parties agree that various errors in the abstracts of judgment" and ending with "and not the determinate abstract of judgment" are deleted.

7. On page 60, after the first full paragraph, ending "as amended by Assembly Bill No. 333" insert the following sentences:

> We reverse the gang-related firearm use enhancements under section 12022.53. The prosecution is allowed 60 days from the date of the remittitur to retry the gang enhancements and gang-related firearm use enhancements. The trial court must modify the judgment and resentence defendants accordingly.

8. On page 60, the third sentence in the second full paragraph, beginning with "The trial court is directed to correct Perez's abstract of judgment" and ending with "on an indeterminate abstract of judgment" is deleted.

9. On page 61, the second sentence from the top, delete the words "and place the indeterminate sentences on counts 6, 7, and 8 and the corresponding firearm enhancements on an indeterminate abstract of judgment form."

10. On page 61, the third sentence in the first full paragraph, beginning with "The trial court is directed to correct Sanchez's abstracts of judgment" and ending with "on an indeterminate abstract of judgment form" is deleted.

This modification changes the judgment.

The petitions for rehearing are denied.

CERTIFIED FOR PARTIAL PUBLICATION.

_____

VIRAMONTES, J.*      LAVIN, Acting P. J.      EGERTON, J.

---

      * Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

# CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B300396 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA143448) |
| v. | |
| LUIS JULIAN BELTRAN PEREZ et al., | |
| Defendants and Appellants. | |

APPEALS from judgments of the Superior Court of Los Angeles County, Kelvin D. Filer, Judge. Affirmed in part, reversed in part, and remanded with directions.

Derek K. Kowata, under appointment by the Court of Appeal, for Defendant and Appellant Luis Julian Beltran Perez.

---

*  This opinion is certified for publication with the exception of the Contentions and parts I, II, IV, V, VII, VIII, IX, X, XI, XII, XIII, XIV, XV of the Discussion. (Cal. Rules of Court, rule 8.1110.)

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant Edgar Manuel Rosas.

Joanna McKim, under appointment by the Court of Appeal, for Defendant and Appellant Salvador Sanchez.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

―――――――――――――

Appellants Luis Julian Beltran Perez, Edgar Manuel Rosas, and Salvador Sanchez engaged in a fist fight with two men outside of a liquor store in the middle of the day. During the fight, Perez retrieved a gun from his car and fired at the two men as they ran into a busy street. Perez's shots missed the men, but struck three passing vehicles, including a four-year-old boy in the backseat of his mother's car. Appellants raise numerous claims on appeal, including the sufficiency of the evidence, admission of expert testimony, application of the natural and probable consequences doctrine to the attempted murder counts, prosecutorial misconduct, and instructional error. Appellants also argue that the abstracts of judgment must be corrected. For the following reasons, we affirm in part and reverse in part the judgments and remand with directions.

## BACKGROUND

### A. *Prosecution evidence*

#### 1. **Testimony of Tyler Oliver and Danny Candler**

Around 11:42 a.m. on June 7, 2017, Tyler Oliver and Danny Candler walked to LMG Liquor (LMG) located on East Compton Boulevard, about one block east of Atlantic Avenue in Compton.

2

As Oliver and Candler approached LMG, Candler saw a group of three to four Hispanic men outside LMG talking to a Black woman.  When Oliver and Candler were near LMG's entrance, Candler noticed that the Hispanic men were staring at him, and he felt uncomfortable.  Candler approached one of the men and asked the group, "What are you staring at?"  No one responded, and Candler asked again.  Someone in the group said, "Fuck niggers."  Someone asked Candler, "[W]here you from?" and "[D]o you bang?"  Candler responded, "[N]o."  Someone repeated, "Fuck niggers," and another yelled out, "Compton Varrio Segundos."

A fight broke out between Candler and the Hispanic males, which Oliver joined.  The fight proceeded west on the sidewalk of Compton Boulevard toward Atlantic Avenue.  Oliver saw a glare from something that he thought was a knife or a gun in the hand of one of the Hispanic men.  Oliver told Candler, "[L]et's go." Oliver and Candler ran side by side into the middle of Compton Boulevard and toward Atlantic Avenue before splitting up, with Candler running down the sidewalk away from the group and Oliver cutting an angle across Compton Boulevard.  When Candler looked back, he saw someone with a gun on the sidewalk and heard a shot fire and saw a muzzle flash.  The back window of a green SUV shattered.  When Candler looked back again, the shooter was in the middle of Compton Boulevard.  Candler heard four or five more shots before he ran across the crosswalk on Atlantic Avenue.

As Oliver neared the intersection at Atlantic Avenue, he asked Silvia U., who had pulled over in her black pickup truck, if he could get in.  Silvia U. unlocked the door and Oliver got in the front passenger seat.  Oliver yelled to Candler to get in as well and the two sat together in the front passenger area.  Silvia U.

drove a short distance before Oliver and Candler got out of the vehicle and thanked her for picking them up. Oliver and Candler proceeded to Candler's aunt's house but did not call the police.

Approximately six months after the shooting, Oliver was pulled over for running a red light. He had a loaded revolver in his car and told deputies he was a "West Coast Crip" gang member.[1]

### 2. Testimony of Sharice Johnson and Miriam Rios

On the day of the shooting, Sharice Johnson went to LMG to purchase something. Johnson spoke with Miriam Rios outside LMG's front door. As Johnson and Rios were talking, Oliver and Candler walked up to LMG while a group of three or four young Hispanic men were talking amongst themselves. Candler aggressively walked up to one of the Hispanic men and asked him, "[W]hat the fuck you lookin' at?" The man looked scared and responded, "I'm not looking at you. I'm not worried about you." Rios heard Candler ask one of the Hispanic men, "[W]here you from," and the man answered, "I don't bang." Johnson then heard Candler say "Duccy Hood Crip." Rios did not hear anyone yell out "Duccy Hood Crips" or "Compton Varrio Segundos."[2]

Candler moved backwards, and the Hispanic group moved towards him. Candler swung first and the other Hispanic men joined in the fight. As the fight moved down the sidewalk

---

[1] At trial, Oliver denied that he said he was a gang member when he was pulled over; rather, Oliver testified that he told the deputy who pulled him over that he knew he was in Crip territory.

[2] Neither Johnson nor Rios heard anyone say the "N word."

towards Atlantic Avenue, another man came from LMG's parking lot area holding a gun by his side. Oliver and Candler ran diagonally into Compton Boulevard. The shooter ran after Oliver and Candler into the middle of the street and then fired two or three shots at them. When Johnson heard the gunshots, she grabbed Rios and took shelter inside LMG.

Johnson called 911.[3] She reported that "two Black boys" walked up to "the Mexicans," who were talking to each other, "and just banged on 'em." The "short Mexican" was getting beaten up and "the other Mexican" showed up with a gun and "just started shooting and they all ran across the street."

### 3. LMG's surveillance videos

The fight and subsequent shooting were captured on LMG's surveillance system. The video shows Johnson and Rios arriving at LMG separately. A few moments later, four Hispanic men, including a man on a bike, Sanchez, and Miguel Cano arrive at LMG together. Two of the men wait outside while Sanchez and Cano walk into LMG. A few moments later, Perez pulls into LMG's parking lot with his car and Rosas arrives on his bike. The group gathers on the sidewalk in front of LMG's entrance and appears to be talking amongst themselves while Cano and Perez stare in the direction of Atlantic Avenue where Candler and Oliver are approaching. Johnson and Rios are seen standing separately outside of LMG talking.

Candler and Oliver approach LMG from Atlantic Avenue. When they are close to LMG's entrance, Candler walks directly to Cano and stops less than a foot away from Cano while Oliver stops in front of LMG's entrance. Candler exchanges words with

---

[3] An audio recording of the 911 call was played to the jury.

5

Cano and Sanchez, and Oliver moves closer to Candler. Candler walks backwards and puts his hands up like he is getting ready to fight. Cano and Sanchez move towards Candler, and Oliver walks backwards toward Atlantic Avenue. As the fight breaks out, Perez runs to his car and retrieves a handgun.

As Candler and Tyler fight with Cano and Sanchez, Rosas joins. The fight continues down the sidewalk towards Atlantic Avenue. Perez returns to the front of the store, holding a gun down by his right side. When Candler and Oliver notice Perez approaching with a gun by his side, they turn and run onto Compton Boulevard as Perez points the gun at them. As Candler and Oliver run behind a parked car and out of view, Perez lowers his gun and chases them into the street.

Appellants' group runs back to LMG while Candler runs in the opposite direction on Compton Boulevard. When appellants' group reaches LMG's parking lot, they run in different directions down an alley behind LMG. Before driving away, Perez hands the gun to Cano and then drives down the alley in the same direction as Rosas and Sanchez.

### 4. Silvia U.'s testimony

Silvia U. was driving westbound on Compton Boulevard approaching Atlantic Avenue while her four-year-old son, Pedro B., and three-year-old daughter, Silvia B., were seated in their car seats behind her. As she approached LMG on her left, she saw two Hispanic men fighting with two Black men in front of the store. Silvia U. stopped at the intersection of Compton Boulevard and Atlantic Avenue for a red light. While Silvia U. was stopped, she heard five to six gunshots and her window break. She panicked and turned right on Atlantic Boulevard and stopped when two Black men approached the passenger side of

her car and asked if they could get in.  The men appeared scared, and Silvia U. wanted to help so she let them in the front passenger seat.  She did not see if the men were armed.

Silvia U. drove down Atlantic Avenue for a few seconds before stopping to check on her children.  As she got out of her vehicle, the two men also exited and left.  One of them said, "God bless you."  When Silvia U. checked on her children, Silvia B. was crying, and Pedro B. was nonresponsive.  Silvia U. noticed blood on Pedro B.'s head and on the headrest behind his car seat.

### 5.    Testimony of Angel Manzo and Ingrid Fuentes

On the day of the shooting, Angel Manzo was driving westbound on Compton Boulevard when he noticed two Black men and a group of Hispanic men fighting next to LMG.  As he drove by, one of the Black men ran behind his truck and the second Black man ran on the sidewalk on his driver's side.  Both men ran towards Atlantic Avenue.  Manzo stopped his truck when his rear windows exploded.  He did not hear any gunshots.

Ingrid Fuentes and her three-year-old son were driving near Compton Boulevard and Atlantic Avenue.  Fuentes pulled onto Compton Boulevard, heading westbound towards Atlantic Avenue.  She heard gunshots and something like a rock hit her car.  A black vehicle crossed in front of Fuentes's vehicle, and she saw a Black man carrying a pistol in his left hand get in the passenger side of the black vehicle.  Fuentes entered a nearby school's parking lot and told a security guard that her car had been struck by a bullet.  She called 911 and reported the shooting.

7

### 6.     Pedro B.'s injuries and treatment

Los Angeles County Sheriff's deputies responded to the shooting.  They transported Pedro B. to the hospital to treat the gunshot wound to the back of his head.[4]

### 7.     Sheriff's investigation

Deputies Francis Quinones and Lamar Johnson responded to the scene and saw Silvia U.'s truck with a shattered window and Pedro B. suffering from a gunshot wound.  There was a bullet hole on the rear driver side window, and a bullet had gone through the rear driver's side headrest.

Manzo's vehicle was on the northeast corner of Compton Boulevard and Atlantic Avenue.  The back glass and rear passenger side windows were shattered.  Two bullets were recovered from the floorboard of the front passenger seat and from the front center area.

There was a bullet hole on the back of Fuentes's vehicle.  A bullet was recovered in the rear door handle area.  Deputies interviewed Fuentes in the elementary school parking lot.  After Fuentes heard gunshots, she stopped her car and saw a young Black man wearing a black hoody run past her car towards Compton Boulevard and Atlantic Avenue.  The young man entered a dark vehicle, and the vehicle drove off.  Fuentes did not mention that the man had a gun, and she was not sure if he was the shooter.

Five cartridge casings were found on Compton Boulevard in

---

[4] Pedro B. had the bullet surgically removed from his head and was placed in a medically induced coma for five days.  When he woke up, he could not talk or move his right side.  At the time of trial, Pedro B., who was six years old, was able to walk, run, and talk like a three year old.

front of a business adjacent to LMG.  The five cartridges were the same brand and fired from the same firearm.  The bullets recovered from Manzo's vehicle, Fuentes's vehicle, and Pedro B.'s head were all fired from the same weapon.

On the evening of the shooting, detectives searched Rosas's residence and recovered a rifle with an empty magazine in his dresser.  Rosas had found the rifle about three weeks prior and did not know if it worked.

Deputies arrested Rosas and interviewed him a few days after the shooting.  He admitted that he had been a member of Compton Varrio Segundos since he was 14 or 15 years old.[5] Rosas said that Compton Varrio Segundos get along with other gangs and that he had never heard of Duccy Hood.  He did not know the Black men who came towards them and did not believe they were in a gang or that they said a gang name before the fight.  He could not recall if they were armed.  Rosas admitted that he was at LMG that day to buy a blunt when he saw persons that he knew and spoke with them.  According to Rosas, the two Black men approached his group and started a fight.  Rosas did not strike anyone.  He said that, after the fight, someone shot "the little kid."  Rosas did not know the shooter had a gun.

Detectives identified Perez's vehicle from the surveillance video and located it at a nearby tire shop where Perez worked.  On the morning of the shooting, Perez arrived around 8:00 a.m. and left for lunch around 11:30 a.m.

### 8.    Gang evidence

Los Angeles County Sheriff's Detective Joseph Sumner testified as the prosecution's gang expert.  Detective Sumner had

---

[5] Rosas was 33 years old at the time of the shooting.

been a gang investigator in Compton and was an expert on Compton Varrio Segundos.

At the time of the shooting, Compton Varrio Segundos had about 80 to 100 members. Compton Varrio Segundos had few allies in the area, but associated with Duccy Hood Compton Crips. Although Compton Varrio Segundos and Duccy Hood Compton Crips fought in the past, at the time of the shooting, there was no conflict between them. Duccy Hood Compton Crips's and Compton Varrio Segundos's territory overlapped, but Duccy Hood had only about 10 members and had mostly disbanded over the past 15 years. Detective Sumner found no evidence that Candler or Oliver were members of Duccy Hood Compton Crips.

LMG is located in Compton Varrio Segundos's territory, and members frequently hang out in front of the store. Detective Sumner opined that gangs use business establishments like LMG to control their territory. They can use it to look out for other gang members coming into their neighborhood, harass people, and to sell narcotics. When a perceived enemy enters a gang's territory, the gang member will ask where they are from and possibly say their gang name.

Detective Sumner testified about rules that gangs tend to follow. If gang members hang out on their territory's borders, someone must have a firearm. Gangs use firearms or weapons to defend themselves and to boost their reputation. Violence escalates more quickly in gang-related fist fights because someone will usually go for a weapon. Committing shootings for the gang elevates the member's reputation and the gang's reputation generally.

Detective Sumner identified Rosas, Perez, Sanchez, and

10

Cano in the surveillance video. He also identified them based on photographs of their gang tattoos.

Based on a hypothetical comprised of the facts of the case, Detective Sumner opined that the fistfight and the shooting were committed for the benefit of the gang because it showed that they were willing to attack anybody that comes into their territory and instilled fear in the community. He also stated that when one member of a gang decides to fight an enemy, other gang members have to join the fight. A group of Hispanic gang members staring down individuals of another race in their territory would constitute a gang challenge.

### B.    *Defense evidence*
#### 1.    **Perez's testimony**

Perez testified on his own behalf. On the day of the shooting, he went to work at the tire shop around 8:00 a.m. Around 11:30 a.m., his mother stopped by with Perez's grandmother. Perez dropped his grandmother off nearby before driving to LMG at 11:40 a.m.

Perez did not plan to meet anyone at LMG. He saw some people he knew inside LMG and greeted them. When he was outside talking with his friends, Candler and Oliver approached the group. Candler yelled at Cano, "[W]hat you lookin' at?" Cano responded, "not at you." No one from Perez's group said Compton Varrio Segundos. Candler said, "I'm from West Coast Crip" and raised his fists. Perez saw Oliver with his hand in his pocket and saw a handle of a gun next to Oliver's right arm. When the two groups started fighting, Perez ran to his car to grab his gun to defend himself and his friends.

After Perez returned from his car, the fight had moved from the front of LMG and down the sidewalk toward Atlantic

11

Avenue. Perez fired four shots when he saw Oliver in the middle of the street pointing a gun toward him and his friends. Perez did not aim at the cars or Oliver but shot in the air.

After the shooting, Perez returned to the tire shop. He did not contact police. Deputies arrested Perez at the tire shop and took him into custody and left him handcuffed in the back of the patrol car for about eight hours before interviewing him. Perez denied being a current member of Compton Varrio Segundos.

### 2. Perez's interview

Detectives interviewed Perez. On the day of the shooting, Perez was at work when his grandmother came to see him around 11:30 a.m. Around 11:45 a.m., Perez's friends Jerry and Karen, who had borrowed Perez's car, came to the tire shop and drove Perez and his grandmother to a nearby charter bus terminal. After his grandmother left on a bus at 12:30 p.m., Perez returned to work. While Perez was waiting at the terminal, he heard two or three gunshots, but did not see anyone shooting.

Perez had been to LMG before but was not there on the day of the shooting. While Perez was with his grandmother at the bus terminal, Karen and Jerry drove around the area. Perez used to be a member of Compton Varrio Segundos but was no longer active. Perez did not own a gun and was scared of guns.

When shown the surveillance video, Perez denied that he was the person shown in the video or that the car was his.

### 3. Defense gang expert

Martin Flores testified as the defense's gang expert. He opined that LMG was not a hangout for Compton Varrio Segundos because the gang's illegal activity would be captured by the surveillance cameras around the store. Further, LMG's

12

location on a main street made the gang an easy target by rival gangs or law enforcement. There was also tagging on and around LMG that did not belong to Compton Varrio Segundos. While Flores found that LMG was within Compton Varrio Segundos's territory, Flores stated that, except in some rare circumstances, gangs do not control local businesses.

He further opined that gangs do not have a rule that members must be armed. Although he admitted that gang-related fights could escalate into a more violent confrontation if a weapon was brought out, they do not have to necessarily escalate into something more violent.

## C. *Procedure*

An amended information charged appellants with premeditated attempted murder (Pen. Code,[6] §§ 187, 664; counts 1, 2), and shooting at an occupied motor vehicle (§ 246; counts 6, 7, 8). Perez was additionally charged with three counts of premeditated attempted murder (§§ 187, 664; counts 3, 4, 5), and Rosas was additionally charged with possession of a firearm by a felon with priors (§ 29800, subd. (a)(1); count 9). As to all counts, it was alleged that the offenses were committed for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)). As to counts 1 through 8, it was alleged that Perez personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subds. (b), (c), & (d)). As to counts 1, 2, 6, 7, and 8, it was alleged that a principal personally and intentionally discharged a firearm

---

[6] All further undesignated statutory references are to the Penal Code.

13

causing great bodily injury (§ 12022.53, subds. (b), (c), (d) & (e)(1)).

The jury convicted Perez of attempted murder in counts 1 and 2 and shooting at an occupied motor vehicle in counts 6, 7, and 8. It found the firearm, gang, and premeditation allegations to be true. The jury also convicted Perez of the lesser included offense of attempted voluntary manslaughter in counts 3, 4, and 5. The jury found the gang allegation and the allegation that Perez personally and intentionally discharged a firearm causing great bodily injury pursuant to section 12022.5, subdivision (a), to be true.

The jury convicted Sanchez and Rosas of attempted murder in counts 1 and 2 and shooting at an occupied motor vehicle in counts 6, 7, and 8. The jury found the firearm and gang allegations to be true as to counts 1, 2, 6, 7, and 8, and rejected the premeditation allegations as to counts 1 and 2. The jury also convicted Rosas of possession of a firearm by a felon in count 9 but found the gang allegations not true as to that count.

The trial court sentenced Perez to 120 years to life in state prison. His sentence consisted of three consecutive 40-years-to-life terms on counts 1, 2, and 6, which each included a 15-years-to-life term plus 25 years to life for the firearm enhancement. The trial court imposed concurrent terms on counts 3, 4, 5, 7, and 8.

Rosas was sentenced to 30 years to life in state prison. The trial court imposed consecutive 15-years-to-life terms on counts 6 and 7, and imposed concurrent terms on counts 1, 2, 8, and 9. The trial court struck the firearm and prior conviction enhancements. Similarly, the trial court sentenced Sanchez to 30 years to life in state prison. It imposed consecutive 15-years-to-

14

life terms on counts 6 and 7, and imposed concurrent terms on counts 1, 2, and 8.  The trial court struck the firearm enhancements.

Appellants appealed.

## CONTENTIONS

Appellants raise numerous issues, including:  (1) the evidence was insufficient to support Perez's conviction for attempted premeditated murder of Candler in count 2; (2) the trial court erred in instructing the jury on the "kill zone" theory; (3) Rosas's and Sanchez's attempted murder convictions should be vacated based on recent amendments that abrogated the natural and probable consequences theory of aiding and abetting attempted murder; (4) the gang enhancements must be vacated based on new legislation; (5) the evidence was insufficient to support Rosas's and Sanchez's convictions for shooting at an occupied motor vehicle under a natural and probable consequences theory of aiding and abetting the uncharged target offense of disturbing the peace; (6) the evidence was insufficient to support the gang enhancements; (7) the trial court erred by instructing the jury with CALCRIM No. 3472 [right to self-defense: may not be contrived]; (8) the trial court erred by not instructing the jury with CALCRIM No. 917 [insulting words are not a defense]; (9) the trial court committed *Sanchez*[7] error by allowing the prosecution's gang expert to testify as to case-specific hearsay; (10) the prosecutor misstated the law of attempted murder; (11) the prosecutor committed *Doyle*[8] error; (12) the prosecutor committed misconduct by making disparaging

---

[7] *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).

[8] *Doyle v. Ohio* (1976) 426 U.S. 610 (*Doyle*).

remarks about defense counsel; (13) the trial court failed to consider its discretion to reduce Perez's punishment for the gun enhancements; and (14) the abstracts of judgment and sentencing minute orders must be corrected.

Appellants joined in each other's arguments to the extent they benefitted their respective claims.

## DISCUSSION

I. **The evidence supports Perez's conviction for attempted premeditated murder of Candler in count 2.**

Perez contends there was insufficient evidence of his intent to kill Candler to convict him of attempted murder in count 2. While Perez concedes that the evidence was sufficient to convict him of the attempted murder of Oliver, he argues that the evidence was insufficient as to Candler because Candler had separated from Oliver and was running on the south side of Compton Boulevard when Perez fired his weapon. We disagree.

A. *Applicable law*

In addressing a challenge to the sufficiency of the evidence supporting a conviction, we examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) Substantial evidence is evidence that is reasonable, credible and of solid value. (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) We presume the existence of every fact the trier could reasonably deduce from the evidence in support of the judgment. (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) We do not reevaluate witness credibility or reweigh evidence. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) "If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not

16

warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Albillar* (2010) 51 Cal.4th 47, 60.) "The standard of review is the same in cases in which the People rely mainly on circumstantial evidence." (*People v. Stanley* (1995) 10 Cal.4th 764, 792.)

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623.) To be guilty of attempted murder, the defendant must intend to kill the alleged victim and the intent to kill must be judged separately as to each alleged victim. (*People v. Smith* (2005) 37 Cal.4th 733, 740.) Because direct evidence of defendant's intent to kill is rare, proof of intent is usually derived from the circumstances of the attempt, including the defendant's actions. (*Id.* at p. 736.) Firing a lethal weapon at the victim, without legal excuse, generally gives rise to an inference that the shooter acted with an intent to kill. (*Id.* at p. 742.) The fact that the victim may have escaped death because of the shooter's poor marksmanship does not necessarily establish a less culpable state of mind. (*Ibid.*)

### B. *Analysis*

There was substantial evidence to support the jury's finding that Perez intended to kill Candler. It is undisputed that Perez fired his gun while standing in the street in front of a parked van. The surveillance video showed that Candler was still in the street with Oliver when Perez stood in front of a van and fired his gun. While the video shows that Candler veered toward the sidewalk after running into the street, it is clear that he did not reach the sidewalk until Perez had turned around to run back toward LMG. From the video and the ballistics

17

evidence, the jury could reasonably infer that Perez shot at both Oliver and Candler because Candler was still in the street and had not veered off from Oliver until after the shots were fired. Accordingly, there was substantial evidence Perez intended to kill Candler.

## II. The trial court erred in instructing the jury on the "kill zone" theory.

Perez argues that his convictions for attempted voluntary manslaughter in counts 3, 4, and 5 must be reversed because there was insufficient evidence to support the People's "kill zone" theory and the jury instruction on that issue was erroneous. We agree.

### A. *Relevant proceedings*

The trial court instructed the jury with CALCRIM No. 600 on the kill zone theory of liability as to the attempted murder charges as follows: "A person may intend to kill a specific victim or victims and at the same time intend to kill everyone in a particular zone of harm or kill zone. In order to convict the defendant of the attempted murder of Silvia U[.], Pedro B. and/or Silvia B., the People must prove that the defendant not only intended to kill Tyler Oliver and/or Danny Candler but also either intended to kill Silvia U[.], Pedro B., and/or Silvia B., or intended to kill everyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill Silvia U[.], Pedro B., and Silvia B., or intended to kill Tyler Oliver and/or Danny Candler by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Silvia U[.], Pedro B.[,] and Silvia B."

The trial court also instructed the jury on the lesser included offenses of attempted voluntary manslaughter

18

(CALCRIM Nos. 603 [heat of passion] and 604 [imperfect self-defense]).  CALCRIM No. 603 instructed that Perez had to intend to kill the victim, and CALCRIM No. 604 instructed that Perez had to intend to kill when he acted.  The instructions for attempted voluntary manslaughter did not mention the kill zone theory.

In her closing argument, the prosecutor argued that Perez created a kill zone around Silvia U.'s vehicle.  "Kill zone. This is an instruction that you're going to receive.  So how does this apply to attempted murder and specifically to shooting.  What it says is that a shooter—a kill zone is essentially when a shooter intends to kill everyone in a particular . . . zone of harm, and your job . . . is to figure out a zone of harm in this case.  And I argue to you that the zone of harm was near Silvia's car.  And you can use some of the exhibits that were marked on to see how we got to a zone of harm because essentially as Tyler ran towards Silvia's car, Perez fired multiple shots.  So in intending to kill Tyler[,] Perez also intended to kill everyone in that area including Silvia, Pedro, age four, and Silvia[,] age three."

During her rebuttal, the prosecutor argued:  "And you want to know why it's attempted murder and kill zone and nothing less and why you shouldn't even consider attempted voluntary manslaughter?  There's a reason why the sheriffs took measurements of where that bullet hole was.  There's a reason why they did that.  Because defendant Perez was going for the kill shot.  He was going for the head shot.  And because Pedro just happened to be riding in a truck in a car seat, his head— [¶] . . . [¶]  Because Pedro happened to be in a truck riding in a car seat and at a higher level than he otherwise would be, when defendant Perez shot towards Tyler Oliver near [the] car trying

19

to kill him with a head shot, he hit the wrong head. And that's why, you know, it's attempted murder. Kill zone. It's willful, deliberate, premeditated."

### B. *Applicable law*

The kill zone theory was introduced to California in *People v. Bland* (2002) 28 Cal.4th 313. There, the defendant shot into a car and, as the driver began to drive away, the defendant and another man continued shooting at the car. (*Id*. at p. 318.) The driver died, and the two passengers in the vehicle were wounded. (*Ibid*.) The defendant was convicted of the murder of the driver and the attempted murder of the two passengers. (*Ibid*.) Our Supreme Court held that "although the intent to kill a primary target does not *transfer* to a survivor, the fact the person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within . . . the 'kill zone.' 'The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. For example, an assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed. Similarly, consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim.

When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death. The defendant's intent need not be transferred from A to B, because although the defendant's goal was to kill A, his intent to kill B was also direct; it was concurrent with his intent to kill A. Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.' " (*Id.* at pp. 329–330.)

In *People v. Canizales* (2019) 7 Cal.5th 591, our Supreme Court limited kill zone liability. In *Canizales*, the defendants encountered a rival gang member at a neighborhood block party attended by 30 or so people. One of the defendants fired five bullets from either 100 or 160 feet away at the intended victim who was standing next to a gang associate. Neither the intended victim nor the gang associate was hit, but a bystander was killed. (*Id.* at pp. 599–600.) The defendants were charged with one count of murder and two counts of attempted murder of the intended victim and his gang associate. (*Id.* at p. 600.) The trial court gave CALCRIM No. 600, a kill zone instruction, addressed to the attempted murder of the gang associate. (*Id.* at p. 601.)

The *Canizales* court found the kill zone instruction to be prejudicial error. It held that "a jury may convict a defendant under the kill zone theory only when the jury finds that: (1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant

21

intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*People v. Canizales, supra,* 7 Cal.5th at pp. 596–597.) It also held that, "the kill zone theory does not apply where 'the defendant merely subjected persons near the primary target to lethal risk. Rather, in a kill zone case, the defendant has a primary target and reasons [that] he cannot miss that intended target if he kills everyone in the area in which the target is located.' " (*Id.* at p. 607.) The court stated that in "determining the defendant's intent to create a zone of fatal harm and the scope of any such zone, the jury should consider the circumstances of the offense, such as the type of weapon used, the number of shots fired (where a firearm is used), the distance between the defendant and the alleged victims, and the proximity of the alleged victims to the primary target." (*Ibid.*)

Based on the evidence here, we cannot say that the only reasonable inference from the evidence was that Perez created a kill zone around Candler and Oliver and that Silvia U., Silvia B., and Pedro B. were within that zone. The ballistics evidence shows that Perez fired at Candler and Oliver as they ran into Compton Boulevard and in the process hit three separate vehicles. There was a bullet hole on the back of Fuentes's vehicle, and a bullet was found in the rear door handle area. A bullet shattered the rear windshield of Silvia U.'s vehicle and

22

there was a bullet hole on the rear driver side window.  A bullet went through the rear driver's side headrest and a fired bullet was recovered from Pedro's head.  In Manzo's vehicle, investigators recovered a fired bullet from the front center area and a bullet fragment from the floorboard of the front passenger seat.  The ballistics evidence clearly shows that Perez was targeting Oliver and Candler as they ran away, but it does not support the conclusion that Perez intended to kill everyone around Oliver and Candler.  Rather, the evidence supports the inference that Perez acted with conscious disregard of the risk of death when he fired into a busy street in the middle of the day, not that he intended to create a zone of fatal harm to ensure his primary targets' death.  Accordingly, we conclude that the kill zone instruction was error under the circumstances of this case.

The People assert that even if the kill zone instruction was erroneous, it was harmless beyond a reasonable doubt.  We disagree.

To determine whether an erroneous kill zone instruction was prejudicial and requires reversal, we examine the entire record and ask " 'whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error.' " (*People v. Canizales*, *supra*, 7 Cal.5th at p. 615.) Considering the evidence regarding the shooting, the prosecutor's argument, and the jury's verdict, we conclude that the error was not harmless beyond a reasonable doubt.

There is no evidence that Perez specifically intended to kill Silvia U., Silvia B., and Pedro B.  The record shows that Perez shot at Candler and Oliver as they ran down Compton Boulevard and happened to hit the vehicles as they passed by or stopped for a red light.  There is no evidence that Perez targeted any of the

23

vehicles or that he was aware of their occupants. The People contend that there was evidence in the record to suggest Perez specifically intended to kill the occupants of Silvia U.'s vehicle based on Fuentes's testimony that she heard gunshots and saw Silvia U.'s truck cross in front of her, then saw a Black man with a gun get in the passenger side of the vehicle. The People further contend that from Fuentes's testimony, the jury could reasonably infer that Perez targeted Silvia U.'s vehicle because he believed that Silvia U. was an associate of Oliver and Candler trying to pick them up. The People's contention, however, is unsupported by the record. There is no evidence that Perez targeted Oliver and Candler as they entered Silvia U.'s vehicle. The evidence shows that, by the time Oliver approached Silvia U. for assistance, she had already turned onto Atlantic Avenue and pulled over because she panicked after her vehicle was struck by bullets. Oliver stated that he heard gunshots as he ran up Compton Boulevard toward Atlantic Avenue, not when he was near or entering Silvia U.'s vehicle. Further, by the time Candler ran in the direction where Silvia U.'s vehicle had stopped and picked up Oliver, Perez and his group were running back towards LMG's parking lot. Thus, there was insufficient evidence that Perez intended to kill Silvia U., Silvia B., and Pedro B. Moreover, the prosecutor's closing argument shows that she relied exclusively on the kill zone theory to convict Perez in counts 3, 4 and 5. While the People are correct that the attempted voluntary manslaughter instructions did not mention the kill zone theory, the jury was instructed that it could find that Perez intended to kill Silvia U., Silvia B., and Pedro B. by intending to kill everyone in a particular zone. Because there was no evidence of Perez's specific intent to kill the occupants of

24

Silvia U.'s vehicle, the jury must have accepted the prosecution's theory that the intent to kill was established by Perez's intent to create a fatal zone of harm around Candler and Oliver when he fired one to two shots that struck Silvia U.'s vehicle.  Accordingly, the trial court's kill zone instruction amounted to prejudicial error and the attempted voluntary manslaughter convictions in counts 3, 4, and 5 must be reversed.[9]

Additionally, we must decide whether the prosecution may retry these counts on remand.  We conclude that it may not.  If reversal is required for instructional error but substantial evidence supports the verdict, double jeopardy does not bar retrial.  (*People v. Hallock* (1989) 208 Cal.App.3d 595, 607.)  However, a reversal based on the insufficiency of the evidence constitutes an acquittal and bars retrial.  (*People v. Seel* (2004) 34 Cal.4th 535, 544.)  Because we find there was insufficient evidence that Perez specifically intended to kill Silvia U., Silvia B., and Pedro B., we conclude that double jeopardy bars retrial of counts 3, 4, and 5.

## III.  Rosas's and Sanchez's convictions for attempted murder must be reversed.

Sanchez and Rosas argue that their attempted murder convictions must be vacated and redesignated as violations of disturbing the peace because the jury was instructed on the natural and probable consequences theory of aiding and abetting, which was invalidated by Senate Bill No. 775.  The People agree

---

[9] Because we are reversing the attempted voluntary manslaughter counts against Perez, we do not address his remaining arguments related to those convictions, specifically, whether his sentence for attempted voluntary manslaughter in count 5 should have been stayed pursuant to section 654.

that the attempted murder counts must be reversed, however, they assert that we should remand the matter to give the prosecution the opportunity to retry counts 1 and 2.

Senate Bill No. 1437 amended the law of accomplice liability for murder by amending the felony murder rule and the natural and probable consequences doctrine.  (*People v. Gentile* (2020) 10 Cal.5th 830, 842.)

Senate Bill No. 1437 also added section 1170.95, which created a procedure by which a person convicted of felony murder or murder under a natural and probable consequences theory could apply to have his or her murder conviction vacated and be resentenced on any remaining counts.  (§ 1170.95, subd. (a).) Pursuant to section 1170.95, an offender must file a petition averring that:  "(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine. . . .  [¶]  (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder.  [¶]  (3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019."  (§ 1170.95, subds. (a)(1)–(3).)

If the petitioner makes a prima facie showing that he falls within the provisions of section 1170.95, the court issues an order to show cause.  (§ 1170.95, subd. (c).)  The court then holds a hearing to determine whether to vacate the murder conviction, recall the sentence, and resentence the petitioner on any remaining counts.  (§ 1170.95, subd. (d)(1).)  The burden of proof is on the prosecution "to prove, beyond a reasonable doubt, that

26

the petitioner is ineligible for resentencing.  If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges.  The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (§ 1170.95, subd. (d)(3).)  In *People v. Gentile*, *supra*, 10 Cal.5th at page 855, our Supreme Court held that the section 1170.95 petitioning process was the exclusive mechanism for seeking retroactive relief for those defendants who were convicted under a natural and probable consequences theory of murder regardless of whether a sentence was final.

Senate Bill No. 775 (2021–2022 Reg. Sess.), which took effect on January 1, 2022, amended the section 1170.95 petition process to include individuals convicted of "attempted murder under the natural and probable consequences doctrine." (Stats. 2021, ch. 551, § 2.)  It further allows offenders to challenge their convictions that come under the purview of section 1170.95 on direct appeal.  (§ 1170.95, subd. (g).)

The parties agree that the trial court erred by instructing the jury on the natural and probable consequences doctrine with respect to the attempted murder charges.  Moreover, they agree that Senate Bill No. 775 applies to this case because Rosas and Sanchez will not have exhausted their appeal rights from their judgments of conviction and sentence before January 1, 2022 when the law became effective.  (See *In re Estrada* (1965) 63 Cal.2d 740, 744–745 [absent evidence of contrary legislative intent, we infer Legislature intended ameliorative criminal statutes to apply to all cases not final when statutes become effective].)  The parties disagree, however, as to the appropriate

27

remedy. Rosas and Sanchez assert that we must reverse their convictions and redesignate their attempted murder convictions to the uncharged target offense of disturbing the peace.

Senate Bill No. 775 was silent on what the appropriate remedy is for a defendant who successfully challenges the validity of his conviction on direct appeal. Thus, it is unclear whether we should find the evidence insufficient and vacate the murder conviction or whether we must find the evidence insufficient and remand the matter to the trial court to allow the prosecution to offer new or additional evidence to meet its burden to prove beyond a reasonable doubt that the defendants are guilty under a still valid theory of murder. Section 1170.95, subdivision (d)(3) allows both parties to produce additional evidence and gives the prosecution an opportunity to establish a valid theory of murder, such as direct aiding and abetting implied or express malice murder. While the Legislature amended both subdivisions (d)(3) and (g), it did not state that vacation of the conviction on appeal without a subdivision (d)(3) hearing is the appropriate remedy.

Here, we conclude that reversing the convictions and remanding the matter to give the prosecution the opportunity to retry the attempted murder counts against Sanchez and Rosas is appropriate. The statutes clearly contemplate an opportunity for the prosecution to present new or additional evidence to show that defendants can still be convicted under a valid theory of aiding and abetting. Moreover, double jeopardy principles do not forbid retrial here even though the prosecutor acknowledged at trial that there was insufficient evidence to support a direct aiding and abetting theory. Where the prosecution makes its case under the law as it stood at trial, double jeopardy is not

28

implicated as it would otherwise be where there is insufficient evidence.  (*People v. Shirley* (1982) 31 Cal.3d 18, 71; see *Burks v. United States* (1978) 437 U.S. 1, 11–15.)  Thus, we reverse the attempted murder counts as to Sanchez and Rosas and direct the trial court to allow the prosecutor to retry those counts based on a currently valid theory.

IV.   **Sanchez's and Rosas's convictions for shooting at an occupied motor vehicle are supported by substantial evidence.**

Although we conclude that Rosas's and Sanchez's convictions for attempted murder must be reversed because they were based on the now invalid theory of the natural and probable consequences doctrine as applied to attempted murder, we must still address their contentions that their convictions for shooting at an occupied motor vehicle, which were based on the same theory of aiding and abetting, are supported by substantial evidence.  We conclude that they are.

A.    *Additional background*

The prosecution's theory of guilt in counts 6, 7, and 8 as to Sanchez and Rosas was based on the natural and probable consequences theory of aiding and abetting the uncharged target offense of disturbing the peace by unlawfully fighting or challenging someone to fight in a public place (§ 415, subd. (1)).

The jury was instructed with CALCRIM No. 403, which read in part:  "To prove that the defendant is guilty of [a]ttempted [m]urder or [s]hooting [a]t [an] [o]ccupied [m]otor [v]ehicle, the People must prove that:  [¶]  1.  The defendant is guilty of [d]isturbing the [p]eace:  [f]ighting or [c]hallenging [s]omeone to a [f]ight;  [¶]  2.  During the commission of [d]isturbing the [p]eace:  [f]ighting or [c]hallenging [s]omeone to a

29

[f]ight, a co-participant in that crime committed the crime of [a]ttempted [m]urder or [s]hooting [a]t [an] [o]ccupied [m]otor [v]ehicle; [¶] AND [¶] 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the [a]ttempted [m]urder or [s]hooting [a]t [an] [o]ccupied [m]otor [v]ehicle was a natural and probable consequence of the commission of [d]isturbing the [p]eace: [f]ighting or [c]hallenging [s]omeone to a [f]ight." For the uncharged target offense of disturbing the peace, the trial court instructed the jury with CALCRIM No. 2688 as follows: "The defendant is charged with disturbing the peace in violation of . . . section 415(1). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant willfully and unlawfully fought or challenged someone to fight; [¶] 2. The defendant and the other person were in a public place when the fight occurred or the challenge was made; [¶] 3. The defendant did not act in self-defense or in defense of someone else. [¶] Someone commits an act *willfully* when he or she does it willingly or on purpose."

B. *Applicable law*

"Under California law, a person who aids and abets a confederate in the commission of a criminal act is liable not only for that crime (the target crime), but also for any other offense (nontarget crime) committed by the confederate as a 'natural and probable consequence' of the crime originally aided and abetted." (*People v. Prettyman* (1996) 14 Cal.4th 248, 254.) To convict a defendant of a nontarget crime as an aider and abettor under the natural and probable consequences doctrine, the prosecution must show that the defendant "(1) with knowledge of the confederate's unlawful purpose; and (2) with the intent of

30

committing, encouraging, or facilitating the commission of any target crime(s); (3) aided, promoted, encouraged, or instigated the commission of the target crime(s).  The jury must also determine whether (4) the defendant's confederate committed an offense *other than* the target crime(s); and whether (5) the offense committed by the confederate was a natural and probable consequence of the target crime(s) that the defendant encouraged or facilitated."  (*Id.* at p. 271.)

"A nontarget offense is a ' "natural and probable consequence" ' of the target offense if, judged objectively, the additional offense was reasonably foreseeable.  [Citation.]  The inquiry does not depend on whether the aider and abettor actually foresaw the nontarget offense.  [Citation.]  Rather, liability ' "is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted." '  [Citation.]  Reasonable foreseeability 'is a factual issue to be resolved by the jury.' "  (*People v. Chiu* (2014) 59 Cal.4th 155, 161–162.)

As stated above, we review a challenge to the sufficiency of the evidence by examining the whole record in the light most favorable to the judgment to determine whether there is substantial evidence.  (*People v. Alexander* (2010) 49 Cal.4th 846, 917.)

### C.    *Analysis*

Sanchez and Rosas argue that substantial evidence does not support their convictions for shooting at an occupied motor vehicle under a natural and probable consequences theory of aiding and abetting because Perez was not a coparticipant in the uncharged target offense of disturbing the peace and shooting at

31

an occupied vehicle was not a foreseeable consequence of disturbing the peace. Rosas argues separately that there is insufficient evidence that he participated in the fight. These contentions are without merit.

First, there is substantial evidence that Perez was a co-participant in the fight. Although he was not involved in the verbal altercation and the subsequent fist fight, he engaged in the "maddogging" that led to the altercation, which the prosecution's gang expert testified could constitute a challenge to fight. Specifically, when gang members of one race stare down people of another race in their territory, this constitutes a gang challenge. Candler testified that appellants' group, including Perez, stared at him and Oliver as they neared LMG. From this evidence, the jury could infer that Perez's initial conduct of staring at Tyler and Oliver constituted an unlawful challenge to fight.

Second, the shooting was a foreseeable consequence of engaging in a gang-related fist fight. Courts have found that gang-related fist fights are likely to escalate to more violent confrontations involving weapons. (See, e.g., *People v. Medina* (2009) 46 Cal.4th 913, 923 [shooting a reasonably foreseeable consequence of the gang assault]; *People v. Smith* (2014) 60 Cal.4th 603, 619–620 [murder a foreseeable consequence from gang-related assault or battery or disturbing the peace].) It is immaterial that Perez did not have a gun when the fist fight broke out or that Sanchez and Rosas were unaware that Perez had a gun. "[P]rior knowledge that a fellow gang member is armed is not necessary to support a defendant's . . . conviction as an aider and abettor." (*Medina*, at p. 921.) Given the great potential for escalating violence during gang confrontations, it is

32

not necessary that defendants specifically knew their fellow gang member had a gun. (*People v. Montes* (1999) 74 Cal.App.4th 1050, 1056.) As such, there was substantial evidence from which a jury could reasonably infer that appellants would have known that the shooting was a foreseeable consequence of disturbing the peace.

Third, we disagree with Rosas's contention that he did not participate in the target crime because he was acting in defense of Cano and Sanchez. The surveillance video supports the conclusion that Rosas was engaged in mutual combat as he walked toward the fight and then joined himself. The jury was free to reject his argument that he was acting in defense of Sanchez and Cano.

## V. The prosecutor did not misstate the law of attempted murder.

Perez contends that the prosecutor committed misconduct during closing argument by misstating the law on attempted murder as to Candler when she argued that pointing a gun at Candler was sufficient evidence of Perez's intent to kill.

### A. *Relevant proceedings*

During closing argument, the prosecutor argued counts 1 and 2 for the attempted murders of Tyler and Candler as follows: "Let's start with attempted murder. There[ ] [are] two elements . . . [d]efendant committed at least one direct but ineffective step towards killing another person. So it's a step. You do something towards killing another person. And when you do the step you had the intent to kill. He—as in the defendant— intended to kill that person. So how do we know that in this case? Perez pointed a gun at Danny and Tyler as they ran away. We know that. You see it on the video. He lifts up the gun. I

33

don't think he even gets it past this point, and they run. Their backs are towards him, and he points it. Now, I don't know if he got a shot off in that first moment because the cartridge casings are where he was standing later in the video. But even just the mere pointing that gun is a direct but ineffective step towards killing another person. And why is that? Because we all know that guns are used to kill. So when you point a gun at another person, you're telling the world you intend to kill them. [¶] Tyler ran into the street. He's by three, occupied cars. That's when we know for certain now defendant Perez is in the street and how he's shooting. So that too goes to a direct but ineffective step towards killing another person. And we know he had the intent to kill. He fired off five shots. He hit all three cars that were in the street at the time as Tyler is running beside those cars. Defendant Perez is a pretty good shot." Appellants' trial counsel did not object to the argument.

## B. *Applicable law*

" '[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements.' " (*People v. Hill* (1998) 17 Cal.4th 800, 829.)

Instances of misconduct require reversal under the federal Constitution when they infect the trial with such unfairness as to make the resulting conviction a denial of due process. (*Darden v. Wainwright* (1986) 477 U.S. 168, 181.) Under California law, a prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct even when those actions do not result in a fundamentally unfair trial. (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1328.) "When a claim of misconduct is

34

based on the prosecutor's comments before the jury, ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' " (*People v. Friend* (2009) 47 Cal.4th 1, 29.)

**C.**     *Analysis*

Perez contends that the prosecutor misstated the law of attempted murder by arguing that he could be guilty of attempted murder by merely pointing the gun at Candler. Perez argues that this statement relieved the prosecution of its burden to prove that Perez took a direct but ineffective step towards killing Candler.

As stated above, to be guilty of attempted murder, the prosecution must prove that defendant intended to kill the victim and took a direct but ineffectual step toward accomplishing the intended killing. (*People v. Ervine* (2009) 47 Cal.4th 745, 785.) A direct act is something more than mere preparation. (*People v. Superior Court (Decker)* (2007) 41 Cal.4th 1, 12.) "Conduct that qualifies as mere preparation and conduct that qualifies as a direct but ineffectual act toward commission of the crime exist on a continuum, ' "since all acts leading up to the ultimate consummation of a crime are by their very nature preparatory." ' " (*Ibid.*) Whether acts are merely preparatory or sufficiently close to the consummation of the crime to constitute an attempt depends on the circumstances of the case. (*Ibid.*) Our Supreme Court has recognized that "the law of attempts would be largely without function if it could not be invoked until the trigger was pulled, the blow struck, or the money seized." (*People v. Dillon* (1983) 34 Cal.3d 441, 455.)

35

As Perez acknowledges, there are certain circumstances where pointing a gun at a victim will support an attempted murder conviction. In *People v. Ervine, supra*, 47 Cal.4th 745 at page 786 our Supreme Court concluded that sufficient evidence supported a conviction for attempting to murder a third police officer, because the evidence indicated that the defendant wanted to kill all the officers at the scene but had undertaken a direct but ineffectual act toward accomplishing the intended killing by firing at the two officers who posed the most immediate threat. In *People v. Nelson* (2011) 51 Cal.4th 198, 212, there was sufficient evidence to convict defendant of attempted murder even though he merely pointed his gun at the victim because he only changed his target when he noticed a nearby patrol car and decided to shoot at the officers who posed a more immediate threat.

The circumstances in this case are such that Perez's pointing the gun at Candler was sufficient to show that he took an ineffectual act toward Candler's killing. The surveillance video shows Perez point his gun at Candler and Oliver while they were on the sidewalk and still close to other members of Perez's group. Perez lowered his gun to chase Candler and Oliver when they ran behind a parked car and then into the street where Perez fired five shots. Such evidence creates an inference that Perez would have shot at Candler and Oliver in the first instance but for his aim being blocked by cars as well as the presence of his cohorts in his line of fire.[10]

---

[10] Because we find that the prosecutor did not misstate the law of attempted murder under the circumstances of this case, we do not address the People's forfeiture argument or Perez's

## VI.   The gang enhancements must be vacated.

Appellants argue that Assembly Bill No. 333 requires that we reverse the true findings on the gang allegations and remand for resentencing pursuant to recently amended Penal Code section 186.22 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 699, §§ 3, 4).  The People agree.

Assembly Bill No. 333 took effect on January 1, 2022 and amended section 186.22 by modifying the definitions of "pattern of criminal activity" and "criminal street gang," and it clarified what is required to show an offense "benefit[s], promote[s], further[s], or assist[s]" a criminal street gang.  It also added section 1109, which requires that, if requested by the defense, a gang enhancement charged under section 186.22, subdivision (d) must be tried separately and only after defendant's guilt of the underlying offense has been established.

"[P]ursuant to the new legislation, imposition of a gang enhancement requires proof of the following additional requirements with respect to predicate offenses:  (1) the offenses must have 'commonly benefited a criminal street gang' where the 'common benefit . . . is more than reputational'; (2) the last predicate offense must have occurred within three years of the date of the currently charged offense; (3) the predicate offenses must be committed on separate occasions or by two or more gang members, as opposed to persons; and (4) the charged offense cannot be used as a predicate offense." (*People v. Lopez* (2021) 73 Cal.App.5th 327, 345.)

---

contention that his counsel was ineffective for failing to object to the prosecutor's statements.

The parties agree that Assembly Bill No. 333 applies retroactively as the judgments are not yet final.  In *In re Estrada, supra,* 63 Cal.2d 740, our Supreme Court held that, absent evidence to the contrary, the Legislature intended amendments to statutes that reduce punishment for a particular crime to apply to all whose judgments are not yet final on the amendments' operative date.  Because Assembly Bill No. 333 increases the threshold for conviction of the section 186.22 offense and the imposition of the enhancement, the defendants are entitled to the benefit of this change in the law.  We therefore vacate the gang-related enhancement findings and remand the matter to give the People the opportunity to prove the applicability of the enhancements under the amendments to section 186.22.[11]

In addition to vacating the gang enhancements, appellants also ask us to reverse the judgements in their entirety because the trial was tainted by the fact that the underlying crimes and the gang enhancements were tried together.  They contend that newly added section 1109, which requires a separate trial on the gang allegations if requested by the defense, should be applied retroactively.  We disagree.

" 'No part of the Penal Code "is retroactive, unless expressly so declared." (§ 3.)  "[T]he language of section 3 erects a strong presumption of prospective operation, codifying the principle that, 'in the absence of an express retroactivity provision, a statute will not be applied retroactively unless it is very clear

---

[11] Because we are reversing the gang enhancements, we do not address appellants' remaining arguments related to those allegations.

38

from extrinsic sources that the [lawmakers] . . . must have intended a retroactive application.' [Citations.] Accordingly, ' "a statute that is ambiguous with respect to retroactive application is construed . . . to be unambiguously prospective." ' " " (*People v. Cervantes* (2020) 55 Cal.App.5th 927, 938.) However, "a 'limited rule of retroactivity' applies to newly enacted criminal statutes that are intended to ameliorate criminal punishment." (*Ibid.*)

Although section 1109 is designed to minimize the prejudicial impact of gang evidence, it does not reduce the punishment or narrow the scope of the application of the gang statute. We therefore conclude that the statute does not apply retroactively to a trial that has already occurred. Appellants' reliance on *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299 is not persuasive. There, our Supreme Court held that newly enacted legislation prohibited prosecutors from charging juveniles with crimes directly in adult court before holding a transfer hearing. (*Id.* at p. 303.) It concluded that the new law potentially reduced the punishment for a class of person, namely juveniles, and should be applied retroactively. The court reasoned that, although the law did not directly reduce the punishment for a particular crime, it was nonetheless ameliorative because a person convicted of serious crimes in adult court could be punished by a long prison sentence whereas juveniles are generally sentenced with rehabilitation as the goal. (*Id.* at p. 306.) Unlike the new law in *Lara*, which was a new procedural law that had the effect of potentially reducing the punishment for a class of defendants, here, section 1109 is a procedural statute that ensures a jury will not be prejudiced by

39

the introduction of evidence to support gang enhancement allegations—it does not reduce the punishment imposed.

Accordingly, we conclude that section 1109 does not require a reversal of the entire judgment.

## VII.  CALCRIM No. 3472 did not prevent the jury from considering appellants' claims of self-defense.

Appellants contend that the trial court's instruction of CALCRIM No. 3472 (right to self-defense:  may not be contrived) prevented the jury from considering their claims of self-defense and defense of others if the jurors found that someone from appellants' group provoked the fight and Candler or Oliver responded with deadly force or a threat of deadly force.  We disagree.

### A.    *Relevant proceedings*

The trial court instructed the jury on the right to self-defense or defense of others as to attempted murder, and as to shooting at an occupied motor vehicle and/or disturbing the peace.  The trial court also instructed the jury with CALCRIM Nos. 3471 and 3472.  CALCRIM No. 3471 covers the right to self-defense in a mutual combat scenario or where the defendant is the initial aggressor, and states in relevant part:  "[I]f the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not required to try to stop fighting, communicate the desire to stop to the opponent, or give the opponent a chance to stop fighting."  CALCRIM No. 3472 instructs that a "person does not have the right to self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."

40

During the prosecutor's closing argument, she discussed CALCRIM No. 3472. She argued, "There's an instruction you're going to get about mutual combat, and that's exactly what's going on in this case. We can . . . sit here for weeks, try to figure out, well, who really started the fight because the male Hispanics were staring them down. He's then saying what are you staring at? . . . [M]utual combat. And you will get an instruction on that. And what it says is a person who engages in mutual combat, starts a fight, has a right to self-defense only if the defendant actually and in good faith tried to stop fighting. Defendant indicated by word or conduct to his opponent that he wanted to stop fighting. Defendant gave his opponent [a] chance to stop fighting. [¶] So that's what we have in this case. You can spend hours trying to figure out who started this fight, but it really boils down to a mutual combat situation. They all mutually decided to fight? And when I say all, I'm including [Candler], Oliver, Perez, Sanchez, Rosas. Law says it can't be contrived. The person does not have the right to self-defense if he provokes his right to create or use force. This is the problem with the staring. This is why the staring is a big deal because you can't stare someone down then say, oh, my god, why did you come up to me, ask me why I was staring at you. That's the problem. All of them staring down Tyler, Danny as they walk down the sidewalk. So as to Rosas [and] Sanchez, this is the process you go through. Was the shooting a natural and probable consequence of the gang fist fight?"

## B. *Applicable law*

We review whether a jury instruction correctly states the law de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) We also independently review whether an instruction effectively

41

directs an adverse finding to the defendant by removing an issue from the consideration of the jury.  (*Ibid.*)

Generally, the self-defense doctrine " ' "may not be invoked by a defendant who, through his own wrongful conduct (e.g., the invitation of a physical attack or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." ' "  (*People v. Enraca* (2012) 53 Cal.4th 735, 761.)

In *People v. Ramirez* (2015) 233 Cal.App.4th 940 (*Ramirez*), the court found that CALCRIM No. 3472 may be inappropriate in circumstances where a defendant intended to provoke only a non-deadly confrontation and the victim responds with deadly force. There, defendants sought out rival gang members for a fight.  (*Id.* at p. 944.)  A fight broke out and one of the rival gang members raised his hand, holding an object that looked like a gun.  (*Id.* at p. 945.)  One of the defendants pulled a gun from his pocket and shot the rival gang member.  (*Ibid.*)  The trial court instructed the jury on mutual combat and contrived self-defense using CALCRIM Nos. 3471 and 3472.  (*Id.* at pp. 945–946.)  In closing argument, the prosecutor invoked CALCRIM No. 3472 and misstated self-defense law, arguing that a defendant's intent to provoke a fight of any kind barred any self-defense claim.  (*Id.* at pp. 943, 946–949.)  The *Ramirez* court found that CALCRIM No. 3472 in conjunction with the prosecutor's argument deprived the defendants of their self-defense theory because if the defendants intended to start a nonlethal fight, they still had the right to defend themselves when the victims responded with lethal force.  (*Id.* at pp. 947–948.)

Appellants make a similar argument here that CALCRIM No. 3472 and the prosecutor's closing argument precluded the

42

jury from accepting their theories of self-defense and defense of others if the jury found that someone in appellants' group provoked the fight even if Candler or Oliver responded with deadly force or a threat of deadly force by displaying a gun.

However, the prosecutor did not argue that appellants' group provoked the fight or were the initial aggressors; rather, she argued that the staring by appellants' group led to a verbal altercation and then everyone mutually agreed to fight. Her argument did not negate CALCRIM No. 3471's instruction that a mutual combatant or an initial aggressor is still entitled to self-defense "if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight." Indeed, defense counsel argued that Candler and Oliver were armed and that appellants acted in self-defense or in defense of each other. Moreover, unlike the prosecutor in *Ramirez*, who repeatedly emphasized that it did not matter that the original victim escalated a nondeadly conflict to a deadly one, here, the prosecutor referred to CALCRIM No. 3472 once in passing and never stated that appellants forfeited their right to self-defense by participating in a fist fight.

Accordingly, there was no instructional error and *Ramirez* does not compel reversal.

## VIII. The trial court properly refused to instruct the jury with CALCRIM No. 917.

Appellants contend that the trial court erred when it refused to give the first paragraph of CALCRIM No. 917 that words and nonthreatening acts are insufficient to justify an assault or battery.

### A. *Relevant proceedings*

43

After the prosecutor's closing argument Rosas's counsel requested the trial court to instruct with a portion of CALCRIM No. 917, which states, "[w]ords[,] no matter how offensive[,] and acts that are not threatening[,] are not enough to justify" an assault or battery. Rosas asserted that "[i]nsulting words are not a defense because she's arguing here they're maddogging him; so it's a mutual combat. This is not—I mean, she can use that argument, but it cannot be somebody is maddogging you, you can throw punches. That is something we should be able to argue." The trial court denied the request, noting that the instruction only applied to battery or assault and that there was no sua sponte duty to give it. The trial court also noted that the jury was instructed on self-defense and that the defendants were not required to retreat thus the parties could argue whether defendants were maddogging at all or whether maddogging was sufficient to justify a response from Candler and Oliver, which were factual questions for the jury.

**B.** *Applicable law*

A trial court must instruct the jury sua sponte on all general principles of law that are connected to the facts and that are necessary for the jury's understanding of the case. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1021.) In addition, a defendant has the right to an instruction that pinpoints the theory of the defense. (*Ibid.*) However, the trial court may refuse an instruction "if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence." (*People v. Moon* (2005) 37 Cal.4th 1, 30.) The trial court's duty to give a pinpoint instruction only extends to instances where the instruction "would not be readily apparent to the jury from the remaining

44

instructions." (*People v. Bolden* (2002) 29 Cal.4th 515, 558–559.) "In determining the correctness of jury instructions, we consider the instructions as a whole." (*People v. Carrasco* (2006) 137 Cal.App.4th 1050, 1061.)

### C. *Analysis*

Here, the trial court properly refused to give the first paragraph of CALCRIM No. 917 as it would have been confusing to the jury. The defense wanted to use the instruction to argue that Candler could not throw punches just because someone was "maddogging" him. However, as the trial court correctly pointed out, the instruction applied to cases where a defendant was charged with assault and battery. Contrastingly, here, the prosecution's theory of the case was that appellants' group along with Candler and Oliver engaged in mutual combat. Whether Candler was justified in his actions was irrelevant. The issue was whether appellants engaged in fighting or challenged someone to fight.

## IX. Admission of Detective Sumner's testimony was not error.

Appellants contend that the admission of the prosecution's gang expert's testimony violated California hearsay law and their Sixth Amendment right of confrontation as articulated by our Supreme Court's decision in *Sanchez*, *supra*, 63 Cal.4th 665.

Appellants assert that Detective Sumner's testimony that gang members commonly come to LMG because they know that is a place other gang members will visit, they seek to harass other gang members at liquor stores, a gang fist fight will escalate to a gang member retrieving a weapon, and a gang rule is to be armed with a gun should not have been presented to the jury. We

45

conclude that this testimony did not violate the principles articulated in *Sanchez*.

### A. *Applicable law*

The Sixth Amendment guarantees a defendant's right to be confronted by the witness against him. (U.S. Const., 6th Amend.; *Sanchez*, *supra*, 63 Cal.4th at p. 679.) Generally, the Sixth Amendment bars admission at trial of a testimonial out-of-court statement offered for its truth against a criminal defendant, unless the maker of the statement is unavailable to testify, and the defendant had a prior opportunity for cross-examination. (*Crawford v. Washington* (2004) 541 U.S. 36, 68.)

In *Sanchez*, *supra*, 63 Cal.4th 665 the defendant was charged with drug and firearm offenses and active participation in a street gang. The prosecution's gang expert relied upon various documents, including a STEP notice,[12] a field identification card, and police reports. (*Id*. at pp. 671–673.) Based on the documents, the expert opined that the defendant was a member of a gang, and the charged crimes benefitted the gang. (*Id*. at p. 673.) The expert had never met the defendant and had not been present when the STEP notice was issued or during any of the defendant's other police contacts. (*Ibid*.) *Sanchez* held "the case-specific statements related by the prosecution expert concerning defendant's gang membership constituted inadmissible hearsay under California law." (*Id*. at p. 670.) "They were recited by the expert, who presented them as

---

[12] STEP notices inform individuals that he or she is associating with a known gang and that if the individual commits certain crimes with gang members, he or she may face increased penalties.

46

true statements of fact, without the requisite independent proof." (*Ibid.*)

Nonetheless, *Sanchez*, *supra*, 63 Cal.4th at pages 676 to 677 did not preclude experts from testifying about general background information or the use of hypothetical questions, in which an examiner could ask an expert to assume certain case-specific facts for which there was independent competent evidence. Further, an "expert may still *rely* on hearsay in forming an opinion, and may tell the jury *in general terms* that he did so. Because the jury must independently evaluate the probative value of an expert's testimony, Evidence Code section 802 properly allows an expert to relate generally the kind and source of the 'matter' upon which his opinion rests." (*Id.* at pp. 685–686.) "Gang experts, like all others, can rely on background information accepted in their field of expertise under the traditional latitude given by the Evidence Code. They can rely on information within their personal knowledge, and they can give an opinion based on a hypothetical including case-specific facts that are properly proven. They may also rely on nontestimonial hearsay properly admitted under a statutory hearsay exception. What they cannot do is present, as facts, the content of testimonial hearsay statements." (*Id.* at p. 685.)

### B. *Analysis*

Here, the admission of Detective Sumner's statements was not error under *Sanchez*. First, his testimony that Compton Varrio Segundos members frequented LMG was based on his personal knowledge of handling calls at that location when he was still a patrol deputy. A gang expert's testimony that is based on personal knowledge is permissible under *Sanchez*. (*People v. Iraheta* (2017) 14 Cal.App.5th 1228, 1248.) Detective Sumner's

47

testimony that gang members hang out at locations like liquor stores within their territory related to gangs generally, not specifically to Compton Varrio Segundos or LMG. His testimony that gangs have rules that require someone to be armed when members are hanging out on the border of their territory or where confrontations are likely was also about gangs generally and not case specific. His testimony that violence escalates faster in gang-related fist fights because someone will retrieve a weapon related to general background information about gang behavior and was also permissible under *Sanchez*. Appellants' contention that Detective Sumner's testimony related directly to their intent is not supported by the record. As discussed above, the detective's testimony that Compton Varrio Segundo members frequented LMG was based on his personal knowledge and his remaining testimony concerned background information about general gang conduct and behavior. Accordingly, we find no error under *Sanchez*.

## X.     There was no *Doyle* error.

Appellants contend we must reverse their convictions on all counts because the prosecutor committed *Doyle* error by commenting on Perez's postarrest silence. We disagree.

### A.     *Relevant proceedings*

At trial, Perez testified that he fired multiple shots after seeing Oliver point a gun at him and his friends, fearing they would be shot.

During the prosecutor's cross-examination of Perez, the following colloquy occurred:

"Q.    So some of your testimony yesterday and today, you shot multiple times into the street because you were in fear for your safety and the safety of your homies, right?

48

"A.     Safety of my friends.  Yes.

"Q.     And yet this is the first time you've ever told anyone from law enforcement your story?

"A.     Yes.

"Q.     You didn't testify to this at the preliminary hearing, right?

"A.     No.

"Q.     So you waited a year and a half, three weeks into this trial, almost thirty witnesses, listened to all the evidence, looked at all the exhibits, and now you're here to tell us that you were so in fear you had to shoot, right?

"A.     Yes."

During a sidebar conference, the trial court cautioned the prosecutor about *Doyle* error and appellants moved for a mistrial. The trial court denied the motions but stated that it would strike Perez's responses and admonish the jurors that Perez had no obligation to testify or present any evidence at any time during the course of legal proceedings.

The trial court then admonished the jury as follows: "[L]adies and gentlemen of the jury, just let me indicate to you I sustained the objection to the last two questions in regards to when Mr. Perez testified or told a story or talked because, as we've said, there's no burden on defense to testify, to produce any witness, to put on a defense.  That includes at the preliminary hearing or even here.  So there was no requirement, obligation on his part.  So just disregard those answers.  Treat them as though you had never heard of them.  Okay.  Everybody understand that?  Can you do that?"  The jurors indicated that they understood the trial court's admonishment.

49

**B.** *Applicable law and analysis*

In *Doyle, supra,* 426 U.S. at page 619, the United States Supreme Court held that a prosecutor violates the federal due process clause by using a defendant's postarrest, post-*Miranda*[13] silence to impeach his or her exculpatory story told for the first time at trial. A *Doyle* violation has two components: (1) the prosecutor makes use of a defendant's postarrest silence for impeachment purposes and (2) the trial court permits that use thus conveying the unmistakable impression that what the prosecution is doing is legitimate. (*Greer v. Miller* (1987) 483 U.S. 756, 761–764.)

Here, the record shows that the trial court took immediate action when the prosecutor asked Perez about his postarrest silence by striking the answers, telling the jury to not consider those answers, and explaining that Perez had no obligation to testify or speak during the course of legal proceedings. The trial court clearly gave its disapproval of the prosecutor's questions and in no way gave the impression that the prosecutor's inquiry was legitimate. The prosecutor made no further mention of Perez's silence, and the trial court did not permit the prosecutor to make use of Perez's postarrest silence for impeachment purposes. Accordingly, there was no *Doyle* error.

## XI. The prosecutor did not make disparaging remarks about Rosas's trial counsel.

Rosas contends that the prosecutor committed misconduct during her examination of Oliver by disparaging his counsel and implying she had deceived Oliver.

**A.** *Relevant proceedings*

---

[13] *Miranda v. Arizona* (1966) 384 U.S. 436.

On direct examination, Oliver testified that he was not a member of a gang on the day of the shooting and that he had never been a gang member.  During cross-examination of Oliver, Rosas's counsel asked him about the first time that she tried to contact him.

"Q.    A few months ago I tried to talk to you, right?

"A.    Yes.

"Q.    And you refused to talk to me, right?

"A.    No.

"Q.    You wouldn't talk with me unless the prosecutor was present, right?

"A.    I told you I felt uncomfortable without the prosecutor there.  Yes.

"Q.    The reason you were uncomfortable is because you knew you had already lied, right?

"A.    No.  I knew because I just wasn't familiar with anything, and I wasn't going to let anybody try to swindle me.

"Q.    Right.  But I introduced myself to you, right?

"A.    Yes, ma'am.

"Q.    And you had already been in court and you knew I represented one of the guys charged in this case, right?

"A.    That was the same day.  Yes.  First day.

"Q.    And you never met me before, right?

"A.    No.

"Q.    So I never tried to swindle you in the past, right?

"A.    No."

During recross, she asked Oliver why he did not contact the police after the shooting.

"Q.    The reason you didn't call the cops is—well, let me back up.  You'd been shot at that day, right?

"A. Yes.

"Q. And according to you, you had done nothing to instigate this shooting, right?

"A. Right.

"Q. So you didn't call the cops because what's the point, right?

"A. Right.

"Q. Because as a gang member, you know, you don't call the cops when you're shot at. You just take care of it personally amongst the gangs yourself, right?

"A. I guess so.

"Q. You guess so. Thank you."

On further redirect, the prosecutor asked Oliver about his interaction with Rosas's counsel.

"Q. The female defense attorney asked you, you know, why you didn't call the police. She said something along the lines because as a gang member, you know, that rule you don't talk to the police. Did you understand that question to mean that you're a gang member?

"A. That's how that felt, but I didn't understand it because I'm not a gang member. That's why I just said it was no point for me to call because it was done.

"Q. So do you feel like you just got swindled?

"A. Yeah. A little bit."

The following exchange between Rosas's counsel and Oliver took place just before the trial court recessed until the next day.

"Q. Just like how you swindled all of us right now?

"A. Um-mm.

"Q. Thank you. [¶] No further questions."

The following day, Rosas's counsel moved for a mistrial based on prosecutorial misconduct. She argued that the prosecutor's questioning implied that she had "swindled" Oliver and thus was "swindling the jurors."

The prosecutor noted that counsel had used the "same verbiage" on further recross examination instead of objecting. The trial court denied the mistrial motion, finding no prosecutorial misconduct and that it would instruct the jurors that what the attorneys say during the course of their questioning was not evidence.

### B.    *Applicable law*

A prosecutor cannot attack the integrity of or cast aspersions on defense counsel. (*People v. Sandoval* (1992) 4 Cal.4th 155, 183–184.) While counsel have broad discretion in discussing the legal and factual merits of a case, personal attacks on the integrity of opposing counsel are prohibited. (*People v. Spector* (2011) 194 Cal.App.4th 1335, 1405.) If the prosecutor's comments create the impression that defense counsel is attempting to deceive the jury, that is prosecutorial misconduct. (*Ibid.*) "On the other hand, '[a]n argument which does no more than point out that the defense is attempting to confuse the issues and urges the jury to focus on what the prosecution believes is the relevant evidence is not improper.' " (*Ibid.*)

### C.    *Analysis*

Here, it is clear that the prosecutor was not attacking defense counsel's integrity. Rather, the prosecutor was simply using language Oliver had initially used and adopted by Rosas's counsel in explaining why he was reluctant to speak with Rosas's counsel without the prosecutor present and to highlight the prior question that assumed Oliver was a gang member even after he

repeatedly denied that fact. The prosecutor never accused Rosas's counsel of swindling Oliver or implied that counsel had sought to deceive the jury. There was no misconduct.

**XII.   Perez's contention that the abstract of judgment needs be corrected to reflect a possibility of parole with a 15-year minimum parole eligibility is moot.**

Perez contends that his abstract of judgment must be corrected to reflect the sentence for counts 1 and 2 is life with the possibility of parole with a 15-year minimum parole eligibility.

Perez was convicted in counts 1 and 2 of attempted willful, deliberate and premeditated murder, and the jury found the firearm and gang allegations to be true. The trial court sentenced Perez to 40 years to life, consisting of 15 years to life, pursuant to section 186.22, subdivision (b)(5), plus 25 years to life for the gun enhancement pursuant to section 12022.53, subdivision (d) for each count. However, the abstract of judgment indicates that Perez was sentenced to 15 years to life pursuant to section 186.22, subdivision (b)(1)(C).

Perez contends that his sentences on counts 1 and 2 should be corrected in the abstract of judgment and the minute order to make clear that he was sentenced to life with a 15-year minimum parole eligibility for the gang enhancement pursuant to section 186.22, subdivision (b)(5) plus 25 years to life for the gun enhancement.

Because we are vacating appellants' sentences for the gang enhancements, this argument is moot.

## XIII. Remand is not required for the court to consider its discretion under *Morrison.*

### A. *Relevant background*

On counts 1, 2, 6, 7, and 8, the jury found true the firearm allegations under section 12022.53, subdivisions (b), (c), and (d), as to Perez.

In Perez's sentencing memorandum, Perez reminded the trial court that it had discretion to strike or dismiss enhancements under sections 1385, 186.22, subdivision (g), 12022.53, subdivision (h), 12022.5, subdivision (c), and California Rules of Court, rule 4.420(c).

Before sentencing, the trial court commented, "I'll just point out for the record how tragic this case really was. It really was totally an avoidable situation and really reflected unnecessary violence and senseless shooting on the part particularly of Mr. Perez." Further, the trial court noted that Perez "brought a gun to a fist fight. He did that. And he fired multiple times. And he chased after the victims. So in this instance certainly the victims were particularly vulnerable, and particularly in the way Mr. Perez carried out the offense indicates planning, sophistication, and professionalism."

The trial court sentenced Perez to 120 years to life in prison as follows: as to counts 1 and 2 (§§ 187, 664), the trial court imposed consecutive terms of 15 years to life (§ 186.22, subd. (b)(5)), plus 25 years to life for the gun enhancement (§ 12022.53, subd. (d)) as to each count; and as to count 6 (§ 246), the trial court imposed a consecutive term of 15 years to life, plus 25 years to life for the gun enhancement (§ 12022.53, subd. (d)).

Perez moved to strike the punishment for the 12022.53, subdivision (d) gun enhancements, which the trial court denied.

Neither the trial court nor Perez's trial counsel discussed the possibility of sentencing Perez to a lesser-included enhancement on counts 1 and 2 or whether it would be appropriate to reduce the punishment, rather than strike it completely.

## B.  *Applicable law*

Effective January 1, 2018, and before Perez was sentenced, section 12022.53, subdivision (h), was amended in relevant part to read:  "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section." While section 12022.53, subdivision (h), as amended, authorized a court to strike a section 12022.53, subdivision (d) enhancement entirely and impose no additional punishment under section 12022.53, the question remained whether the court could also strike the section 12022.53, subdivision (d) enhancement and then impose a lesser enhancement under section 12022.53, subdivision (b) or section 12022.53, subdivision (c), even if the lesser enhancements were not specifically charged in the information or found true by the jury.  (*People v. Morrison* (2019) 34 Cal.App.5th 217, 222–223 (*Morrison*).)  *Morrison* held that a "court had the discretion to impose an enhancement under section 12022.53, subdivision (b) or (c) as a middle ground to a lifetime enhancement under section 12022.53, subdivision (d), if such an outcome was found to be in the interests of justice under section 1385." (*Morrison*, at p. 223.)  Our Supreme Court recently affirmed *Morrison*'s conclusion that courts had the discretion to impose a lesser enhancement under section 12022.53, subdivisions (b) or (c), even when the section 12022.53, subdivision (d) enhancement was not legally or factually inapplicable.  (*People v. Tirado* (2022) 12 Cal.5th 688, 697.)

56

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) When a court is unaware of the scope of its discretion, it cannot exercise that informed discretion. (*Ibid.*) "In such circumstances, . . . the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*Ibid.*) "Absent evidence to the contrary, we presume that the trial court knew and applied the governing law." (*Id.* at p. 1390.) We do not presume the sentencing court was unaware of its discretion simply because it failed to refer to its alternative sentencing choices. (*Ibid.*)

**C.** *Analysis*

Perez argues the trial court was unaware of the scope of its discretion because whether a court had discretion to impose a lesser enhancement under amended section 12022.53 had been decided only a few months prior to the hearing in *Morrison, supra,* 34 Cal.App.5th 217.

We find *Morrison* inapplicable to this case. As stated above, *Morrison, supra,* 34 Cal.App.5th at pages 222 to 223 held that a trial court had discretion to strike a section 12022.53, subdivision (d) enhancement and then impose a lesser enhancement under section 12022.53, subdivisions (b) or (c), even if the lesser enhancements were not specifically charged in the information or found true by the jury. Here, Perez was charged with the lesser enhancements under section 12022.53, subdivisions (b) and (c), as well as the greater enhancement under subdivision (d). The jury found each of those allegations true. Thus, when Perez asked the trial court to strike the greater

enhancement, it was presumably aware that it could have imposed one of the lesser enhancements, which were also charged and proved, by striking the greater enhancement. (See *People v. Wang* (2020) 46 Cal.App.5th 1055, 1090 [distinguishing *Morrison* where all § 12022.53 enhancements were found true].) As such, we reject Perez's contention that the trial court was unaware of the scope of its sentencing discretion.

Because we conclude that *Morrison* is inapposite, we also reject Perez's contention that his counsel was ineffective for failing to apprise the trial court of its discretion to impose a lesser enhancement under section 12022.53, subdivisions (c) and (d).

## XIV. Perez was entitled to an additional day of presentence custody credit.

Perez contends that he is entitled to 909 days of presentence custody credit, consisting of 791 actual days plus 118 days of local conduct credit. We agree.

Section 2900.5, subdivision (a), provides that a defendant is entitled to receive full credit for actual confinement time prior to the commencement of the sentence. "In all felony and misdemeanor convictions, either by plea or by verdict, when the defendant has been in custody, including, but not limited to, any time spent in a jail . . . , all days of custody of the defendant . . . shall be credited upon his or her term of imprisonment." (*Ibid.*)

At sentencing, Perez was awarded 790 days of actual credit and 118 days of local conduct credit for a total of 908 days of presentence custody credit. However, Perez was arrested on June 7, 2017, and was sentenced on August 6, 2019. Based on

these dates, Perez is entitled to one additional day of presentence custody credit for a total of 909 days.

While generally a defendant must seek correction of credits in the trial court before the error may be raised on appeal, a defendant may raise the issue directly in the appellate court first where it is raised in addition to other non-credit issues for the sake of judicial efficiency. (*People v. Acosta* (1996) 48 Cal.App.4th 411, 427.) An incorrect award of presentence custody credits is an unauthorized sentence which may be corrected at any time. (*People v. Gisbert* (2012) 205 Cal.App.4th 277, 282.) We shall, therefore, order its correction.

## XV. The abstracts of judgment and minute orders should be corrected.

The parties agree that various errors in the abstracts of judgment and minute orders must be corrected. Appellants argue that the indeterminate sentences on counts 6, 7, and 8 and the corresponding firearm enhancements should be reflected in the indeterminate abstract of judgment, and not the determinate abstract of judgment. The People also indicate that Perez's abstract of judgment and sentencing minute order should reflect the trial court's monetary orders regarding the trial court's imposition of fines and fees. Rosas contends, and the People agree, that his abstract of judgment must be corrected to reflect the jury's findings that the gang enhancement as to count 9 was not true.[14] As such, we shall order the abstracts of judgment and minute orders corrected to reflect the judgments.

_____

[14] Rosas and Sanchez also contend that their abstracts of judgment must be corrected to reflect the jury's finding that the attempted murders in counts 1 and 2 were not willful, deliberate,

59

## DISPOSITION

We reverse the judgments as to the gang enhancements for all defendants and remand the matter to provide the prosecution with the opportunity to retry the Penal Code section 186.22 enhancements under the law as amended by Assembly Bill No. 333.

We affirm the judgment as to counts 1 and 2 against Luis Julian Beltran Perez. We reverse the judgment as to counts 3, 4, and 5 for voluntary attempted manslaughter against Perez and conclude that double jeopardy bars retrial of those counts. The trial court is directed to correct Perez's abstract of judgment and place the indeterminate sentences on counts 6, 7, and 8 and the corresponding firearm enhancements on an indeterminate abstract of judgment. The trial court is directed to modify Perez's judgment to reflect that Perez is entitled to an additional day of presentence custody credit and modify Perez's sentencing minute order and abstract of judgment to reflect its imposition of fines and fees.

We reverse the judgment as to counts 1 and 2 against Edgar Manuel Rosas and remand the matter to provide the prosecution with the opportunity to retry those causes of action under a currently valid theory of aiding and abetting attempted murder. We affirm the judgment as to counts 6, 7, and 8 against Rosas. The trial court is directed to correct Rosas's abstract of judgment to reflect the jury's finding that the gang allegation as to count 9 was not true and place the indeterminate sentences on

---

or premeditated. Because we are reversing those counts, their contention is moot.

60

counts 6, 7, and 8 and the corresponding firearm enhancements on an indeterminate abstract of judgment form.

We reverse counts 1 and 2 against Salvador Sanchez and remand the matter to provide the prosecution with the opportunity to retry those causes of action under a currently valid theory of aiding and abetting attempted murder. We affirm the judgment as to counts 6, 7, and 8 against Sanchez. The trial court is directed to correct Sanchez's abstracts of judgment and place the indeterminate sentences on counts 6, 7, and 8 and the corresponding firearm enhancements on an indeterminate abstract of judgment form.

CERTIFIED FOR PARTIAL PUBLICATION.


VIRAMONTES, J.[*]


We concur:


LAVIN, Acting P. J.          EGERTON, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.